## THOMAS POULOS *v.* PFIZER, INC., ET AL.
### (SC 15676)

Callahan, C. J., and Borden, Norcott, McDonald and Peters, Js.

---

Argued September 23, 1997—officially released April 28, 1998

*William C. Longa,* with whom was *Patrick J. Fitzgerald,* for the appellant (named defendant).

*Thomas J. Riley,* with whom was *Rita Provatas,* for the appellee (plaintiff).

*Todd A. Bromberg*, pro hac vice, *Mark A. de Bernardo*, pro hac vice, *Peter A. Susser*, pro hac vice, and *Nancy N. Delogu*, pro hac vice, filed a brief for the Institute for a Drug-Free Workplace as amicus curiae.

*Mary E. Kelly* and *Deborah L. McKenna* filed a brief for the Connecticut Employment Lawyers Association as amicus curiae.

*Opinion*

CALLAHAN, C. J. The plaintiff, Thomas Poulos, brought this action in the Superior Court alleging, inter alia,[1] that his employer, the named defendant, Pfizer, Inc.,[2] had required him to submit to drug testing in violation of General Statutes § 31-51x[3] and unlawfully had terminated his employment on the basis of the results of those tests. The trial court determined that:

---

[1] The plaintiff's second amended complaint also alleged intentional infliction of emotional distress and invasion of privacy. The trial court found for the defendant on both of those counts, and the plaintiff has not challenged those rulings in this appeal.

[2] In addition to the named defendant, Pfizer, Inc., PharmChem Laboratories, Inc., was originally a defendant in this proceeding. Thereafter, the case was withdrawn as to that defendant. Hereafter, we refer to Pfizer, Inc., as the defendant.

[3] General Statutes § 31-51x provides: "(a) No employer may require an employee to submit to a urinalysis drug test unless the employer has reasonable suspicion that the employee is under the influence of drugs or alcohol which adversely affects or could adversely affect such employee's job performance. The Labor Commissioner shall adopt regulations in accordance with chapter 54 to specify circumstances which shall be presumed to give rise to an employer having such a reasonable suspicion, provided nothing in such regulations shall preclude an employer from citing other circumstances as giving rise to such a reasonable suspicion.

"(b) Notwithstanding the provisions of subsection (a) of this section, an employer may require an employee to submit to a urinalysis drug test on a random basis if (1) such test is authorized under federal law, (2) the employee serves in an occupation which has been designated as a high-risk or safety-sensitive occupation pursuant to regulations adopted by the Labor Commissioner pursuant to chapter 54, or (3) the urinalysis is conducted as part of an employee assistance program sponsored or authorized by the employer in which the employee voluntarily participates."

(1) the plaintiff's consent to the drug testing was invalid because his consent, having been obtained under threat of termination of his employment, was not voluntary and consequently did not constitute a waiver of his right to challenge the lawfulness of the testing; and (2) the drug testing was unlawful because the defendant lacked reasonable suspicion that the plaintiff was "under the influence of drugs [or alcohol] which adversely affected or could adversely affect" his job performance. Pursuant to General Statutes § 31-51z (a),[4] the trial court awarded the plaintiff damages, interest, attorney's fees and costs. The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

The principal issues on appeal are: (1) whether the trial court properly excluded testimony that the defendant could have discharged the plaintiff for attempting to remove the defendant's property from the workplace, when that testimony was offered by the defendant in support of its claim that the plaintiff had consented voluntarily to the drug test; and (2) whether the trial court properly concluded that the defendant lacked reasonable suspicion to require the plaintiff to undergo a urinalysis drug test. We reverse the judgment and order a new trial.

The record reveals the following facts. On December 20, 1990, the plaintiff, who was employed as a materials clerk at the defendant's Groton plant, acting within his authority, ordered and received a surge protector from one of the defendant's suppliers. At the end of his work

[4] General Statutes § 31-51z (a) provides: "Any aggrieved person may enforce the provisions of sections 31-51t to 31-51aa, inclusive, by means of a civil action. Any employer, laboratory or medical facility that violates any provision of sections 31-51t to 31-51aa, inclusive, or who aids in the violation of any provision of said sections shall be liable to the person aggrieved for special and general damages, together with attorney's fees and costs."

shift, the plaintiff attempted to take the new surge protector out of the defendant's plant in a box. When a security guard at the plant gate asked him what was in the box, the plaintiff lied, stating that the box was empty. A subsequent search by the security guard revealed the surge protector. The plaintiff then lied again, telling the guard that a friend had brought the surge protector to work and had given it to him, and that he simply was taking it home. According to his own testimony, the plaintiff fabricated that story because he was afraid he would be disciplined for attempting to remove the surge protector from the plant.

Because the plaintiff did not have a property pass for the surge protector, the security guard refused to allow the plaintiff to take it through the plant gate. Instead of proceeding home without the surge protector, however, the plaintiff went back into the plant, discarded the box and placed the surge protector in his desk. The plaintiff knew that the guard would report what had happened at the gate, and the plaintiff feared the consequences. He then separately approached two supervisors, Joseph Feeney and Richard Smith, and requested a property pass to take home a used extension cord. When the supervisors questioned him, the plaintiff again lied, claiming that the item the guard had discovered was the used extension cord. Both of the plaintiff's requests for a property pass were refused, and the plaintiff subsequently left the plant without the surge protector or an extension cord. According to the plaintiff's testimony, when he left the plant he was concerned that he would lose his job as a result of his efforts to remove the surge protector.

The following morning, December 21, 1990, Feeney questioned the plaintiff about the events of the previous day. According to his own testimony, the plaintiff was very concerned for his job, and said to Feeney: "I am in trouble. How can I make this easier on myself?" After

again falsely claiming that the item the security guard had discovered in the box was a used extension cord, the plaintiff, when told the guard had made a report, admitted that he had surreptitiously attempted to remove the surge protector from the plant. The plaintiff then claimed that he had attempted to borrow, rather than to steal, the surge protector. The plaintiff was sent home and told not to return to work until December 26. Upon returning home, the plaintiff, on his own initiative, called Marylou Nowak, a personnel supervisor, and made an appointment to discuss the status of his job.

Later in the day on December 21, Feeney and Smith met with Barton Finnegan, the corporate employee responsible for implementing the drug free workplace program at the defendant's Groton plant, and informed him of the incident involving the surge protector. Finnegan decided that the plaintiff should undergo a fitness for duty evaluation (evaluation),[5] and informed the plant physician, Paul Kanfer, of the incident and of other concerns, such as lateness to work, that had been raised regarding the plaintiff's work performance.

When he reported to work on December 26, 1990, the plaintiff was asked to submit to an evaluation. According to his own testimony, the plaintiff replied, "no problem." Before signing the consent form, the plaintiff asked what would happen if he did not consent. The plaintiff testified that he had asked that question "to be clever." At that time, Smith informed the plaintiff that if he did not consent to the evaluation, he would

[5] The defendant's Substance Abuse Program Guidelines provide in relevant part that "[t]esting for substance abuse, as part of a fitness for duty evaluation, will be conducted where an employee manifests aberrant behavior and: 1) the supervisor is unable to determine the cause of the behavior after discussion with the employee, or the supervisor has reasonable suspicion to believe that substance abuse is involved, 2) the supervisor has discussed the problem with the personnel manager and the operating unit head, where applicable, and 3) a medical authority (physician or nurse) agrees that a urinalysis, breath test and or blood test is appropriate."

be sent home pending termination. The plaintiff subsequently signed a consent form that stated, inter alia: "I . . . understand . . . that, as part of the . . . evaluation, my urine . . . may be tested . . . . I understand that if I decline to sign this consent, the [drug testing] will not be conducted but the Personnel Department will be notified and I will be subject to termination of employment. . . ."

At the fitness for duty evaluation, Kanfer was unable to find an alternative explanation for the plaintiff's behavior and determined that a drug test was appropriate under the circumstances, even though he did not detect any outward physical signs of alcohol or drug use at that time. After signing a second consent form, the plaintiff provided a urine specimen. He then was escorted to the plant gate and told not to return to work until the results of the urinalysis were obtained from the lab.

When the plaintiff returned to work on January 2, 1991, he was informed that the test results had revealed cocaine use. The defendant then offered the plaintiff the opportunity to enroll in its employee assistance program (program). Program participants are required to submit to random drug testing. The plaintiff was told that refusal to participate would result in the termination of his employment. At that time, he agreed to participate in the program. On March 1, 1991, his employment was terminated because a random drug test conducted on February 13, 1991, as part of the program was positive for cocaine.[6]

I

The defendant first claims that the trial court improperly excluded testimony that it had offered to support

---

[6] Pursuant to the plaintiff's participation in the program, random drug tests were administered on January 7, January 23 and February 13, 1991. The February 13 testing was positive for cocaine.

its claim that the plaintiff had waived his rights under § 31-51x by voluntarily consenting to the December 26, 1990 drug testing. Specifically, the defendant challenges the exclusion of testimony that the defendant could have terminated the plaintiff's employment solely on the basis of the surge protector incident.[7] We agree with the defendant that the excluded evidence was relevant and material to the defendant's theory of consent, and that the improper exclusion of that evidence by the trial court was harmful.

In order to resolve the defendant's evidentiary claim, we first must consider the role and effect, with respect to § 31-51x, of employee consent to drug testing. Whether and to what extent a private employee can consent to a drug test and thereby waive the "reasonable suspicion" stricture of § 31-51x (a) is a matter of statutory construction and, therefore, "[o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common-law principles governing the same general subject matter." (Internal quotation marks omitted.) *Connecticut National Bank* v. *Giacomi,* 242 Conn. 17, 32, 699 A.2d 101 (1997).

The language of § 31-51x (a) provides that "[n]o employer *may require* an employee to submit to a urinalysis drug test . . . ." (Emphasis added.) Because

[7] The defendant also challenges the exclusion of certain testimony that was offered to establish voluntary consent to the subsequent tests administered pursuant to the employee assistance program. Because a new trial is required with respect to the December 26, 1990 testing, and because any determination of the voluntariness of the plaintiff's participation in the employee assistance program under § 31-51x (b) (3) necessarily depends on the validity of the first test, the validity of the subsequent tests is an appropriate issue to be determined on retrial.

this language provides no guidance as to when, if ever, an employee voluntarily may consent to a urinalysis drug test so that it can no longer be said that the employer has "require[d]" the test, we turn to the relevant legislative history for guidance. See *State* v. *DeFrancesco*, 235 Conn. 426, 436, 668 A.2d 348 (1995).

In 1987, § 31-51x was enacted as part of a comprehensive legislative plan regulating workplace drug testing. See Public Acts 1987, No. 87-551 (P.A. 87-551), now codified at General Statutes §§ 31-51t through 31-51aa. The legislative history indicates that P.A. 87-551 was intended to provide the same protections to private employees in Connecticut as those protections that are afforded to employees of the federal government by the fourth amendment to the United States constitution. See 30 H.R. Proc., Pt. 31, 1987 Sess., p. 11384, remarks of Representative William Kiner ("[T]he constitution of the United States protects all of us from unwarranted intrusions by government. What this bill before us seeks to do is . . . to prevent or protect the [private] employee from unwarranted intrusions by his employer, which the constitution does not cover."). Relying primarily on the 1987 legislative history, the United States District Court for the District of Connecticut has interpreted § 31-51x to embody a consent requirement analogous to that employed in federal fourth amendment jurisprudence. *Doyon* v. *Home Depot U.S.A., Inc.*, 850 F. Sup. 125, 128–29 (D. Conn. 1994). The *Doyon* court concluded that "[§] 31-51x, properly understood as protecting the privacy rights of employees from employer-mandated urinalysis drug testing, is thus analogous to the Fourth Amendment, which protects the privacy rights of employees against Government-mandated urinalysis testing." Id., 128. We agree with the *Doyon* court that the issue of voluntary consent to drug testing under § 31-51x should be

resolved in a manner consistent with federal fourth amendment constitutional law.

The parallel between a private sector employee's rights under our statutory scheme and a federal employee's rights under the fourth amendment obviously would allow an employee to consent to drug testing and waive his rights under § 31-51x, just as he could waive his fourth amendment rights. See *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 233, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). Moreover, allowing an employee the ability to consent to drug testing, and thereby eliminating the risk to the employer that it will be forced to prove reasonable suspicion in future litigation is supported by other legislative history indicating a strong legislative preference for employee assistance programs, rather than summary termination of employment for misconduct. During the floor debates on P.A. 87-551, Representative J. Peter Fusscas stated that "whatever policy that the legislature comes out with should endorse the treatment, the identification and helping people overcome a drug dependency problem." 30 H.R. Proc., Pt. 31, 1987 Sess., p. 11406. Representative Frederick A. Gelsi also expressed concern that those with a drug dependency should be given a chance at rehabilitation. Id., pp. 11400–11402. Similar sentiments were expressed during the floor debates on Public Acts 1991, No. 91-271, § 2, which amended § 31-51x to provide for the promulgation of regulations by the commissioner of labor to define the term "reasonable suspicion." See 34 H.R. Proc., Pt. 16, 1991 Sess., p. 5889, remarks of Representative Reginald G. Beamon ("we should discuss employee assistance programs . . . it's very, very difficult to fund a good [employee assistance] program"); id., p. 5891, remarks of Representative Norma Gyle (when the 1987 legislation was enacted "[w]e wanted to make sure there was access [to employee

assistance programs]"); id., p. 5893, remarks of Representative Joseph A. Adamo ("I could not agree more with the concept of [employee assistance programs] . . . . I think that we ought not test and fire"); id., p. 5901, remarks of Representative Lee A. Samowitz ("I think that the policy of this state should be one of helping and not one of casting aside those who have troubled pasts, those who have a problem").[8]

If employees were unable to waive their rights under § 31-51x under circumstances similar to those of this case, there would be an incentive for employers simply to fire employees, such as the plaintiff, who exhibit poor judgment and who may or may not have a drug problem. By doing so, employers would avoid the risk of being second-guessed by the courts on the issue of reasonable suspicion. As a result, employees would lose the option of agreeing to a drug test, keeping their jobs and receiving appropriate treatment if necessary. The legislative history clearly indicates that the legislature did not intend such a result.

We turn now to a brief analysis of the fourth amendment consent search jurisprudence before analyzing the defendant's specific evidentiary claim. Government employees generally may not be required, as a condition of employment, to relinquish a constitutional right. *Pickering* v. *Board of Education*, 391 U.S. 563, 567–68, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968). Government employees, therefore, generally may not be required to submit to an unreasonable search as a condition of continued employment. *Doyon* v. *Home Depot U.S.A.*,

---

[8] As presented to the Judiciary Committee, the original version of the 1991 legislation provided for employee assistance programs funded by the employers. That provision was removed in committee as part of a compromise with certain large employers that opposed mandatory funding of employee assistance programs. 34 H.R. Proc., Pt. 16, 1991 Sess., p. 5893, remarks of Representative Adamo. A subsequent floor amendment on the same issue eventually was withdrawn. Id., p. 5903.

*Inc.,* supra, 850 F. Sup. 129. An employee, however, may waive his right to challenge the constitutionality of a search by voluntarily consenting to that search. *Zap* v. *United States,* 328 U.S. 624, 628, 66 S. Ct. 1277, 90 L. Ed. 1477 (1946), judgment vacated on unrelated grounds, 330 U.S. 800, 67 S. Ct. 857, 91 L. Ed. 1259 (1947); *Mack* v. *United States,* 814 F.2d 120, 125 (2d Cir. 1987) (because evidence before trial court established that employee voluntarily had given consent to drug testing, there was no need for trial court to have considered whether testing was supported by reasonable suspicion); *Doyon* v. *Home Depot U.S.A., Inc.,* supra, 129.[9]

"To ascertain whether consent is valid, courts examine the *totality of all the circumstances* to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." (Emphasis added; internal quotation marks omitted.) *United States* v. *Garcia,* 56 F.3d 418, 422 (2d Cir. 1995). Voluntariness " 'can be found from an individual's words, acts or conduct.' " *United States* v. *Deutsch,* 987 F.2d 878, 883 (2d Cir. 1993). *"No one factor is controlling."* (Emphasis added.) *State* v. *Torres,* 197 Conn. 620, 627, 500 A.2d 1299 (1985); *State* v. *Reddick,* 189 Conn. 461, 469, 456 A.2d 1191 (1983). A conclusion about consent necessarily involves an inquiry into the putative consenter's state of mind.

[9] The court in *Doyon* found that under the circumstance of that case, the employee's consent was not voluntary because the employee legitimately feared that his employment would be terminated if he refused to consent. *Doyon* v. *Home Depot U.S.A., Inc.,* supra, 850 F. Sup. 130. In *Doyon,* the plaintiff was forced to choose between two alternatives: (1) submitting to the drug test; or (2) being discharged for not submitting. Id. The defendant did not claim that the plaintiff had consented to the testing for any reason other than to avoid discharge for failing to consent. In the present case, however, as discussed later in this opinion, the evidence is capable of supporting an inference that the plaintiff consented to the testing in order to avoid being disciplined for the surge protector incident rather than to avoid being discharged for refusing to consent.

*Dotson* v. *Warden*, 175 Conn. 614, 619–20, 402 A.2d 790 (1978).

Consent given for the purpose of obtaining a legitimate benefit may constitute a valid waiver of fourth amendment rights. *Zap* v. *United States*, supra, 328 U.S. 628 (individual who worked as independent contractor for government waived his fourth amendment right by agreeing to contract provision requiring him to submit to inspections; inspections were required as condition of becoming government contractor); see generally *Mararri* v. *WCI Steel, Inc.*, 130 F.3d 1180 (6th Cir. 1997) (last chance agreement requiring urine testing as condition of continued employment valid under traditional contract principles where employer had cause for firing employee and employee bargained for tests in order to retain job). The mere fact that an individual is "faced with a difficult choice of options which may have exerted pressure on him" does not "[render] apparent consent ineffective." *State* v. *Torres*, supra, 197 Conn. 627 (defendant consented because of belief he might be searched in any event). Consent that is motivated by a desire to cooperate, rather than given merely in acquiescence to a show of authority, is valid. *McMorris* v. *Alioto*, 567 F.2d 897, 901 (9th Cir. 1978) (attorney's consent to courthouse search; search was price of entering to discharge duties as attorney); see also *United States* v. *Lloyd*, 868 F.2d 447, 451–52 (D.C. Cir. 1989) (consent motivated by desire to deflect suspicion by showing individual had nothing to hide); *United States* v. *Culp*, 472 F.2d 459, 461 (8th Cir.), cert. denied, 411 U.S. 970, 93 S. Ct. 2161, 36 L. Ed. 2d 692 (1973) (consent motivated by desire to negotiate leniency for third party; consent was given under threat that search warrant would be obtained); *State* v. *Niemszyk*, 303 A.2d 105, 109 (Me.), cert. denied, 414 U.S. 1042, 94 S. Ct. 544, 38 L. Ed. 2d 333 (1973) (consent motivated by desire to establish noninvolvement; consent was given

under threat of being "taken 'downtown'" to police station).[10] In the present case, therefore, proper determination of whether the plaintiff's consent was given voluntarily required a "careful sifting of the unique facts and circumstances of [this] case"; *Schneckloth* v. *Bustamonte*, supra, 412 U.S. 233; to determine the plaintiff's state of mind at the time he consented.

Having established the general parameters of the law of consent searches, we now turn to the specific theory of consent that the defendant sought to present to the trial court. Throughout trial, the defendant sought to adduce evidence that, from the moment the plaintiff was stopped by the security guard, he was concerned that he would lose his job for attempting to remove the defendant's property from the plant without appropriate authorization. The plaintiff's own testimony indicates that on December 20, 1990, the plaintiff fabricated his story about receiving the surge protector from a friend and his story about the used extension cord because he was afraid that he would be disciplined for improperly attempting to take the surge protector home. When the plaintiff left the plant on December 20, he feared that he would lose his job because of that attempt. When confronted about the surge protector incident on December 21, 1990, the plaintiff was very concerned for his job, and, before the specter of termination was ever raised by the defendant, the plaintiff asked what he could do to "make this easier on [himself]." That afternoon, concern about being disciplined

---

[10] See also S. Kreimer, "Allocational Sanctions: The Problem of Negative Rights in a Positive State," 132 U. Pa. L. Rev. 1293, 1383–85 (1984) ("If the . . . right in question is designed to secure an area of autonomy for the citizen . . . it would seem that the exercise or nonexercise within that area should be in the hands of the citizen. . . . [T]o refuse . . . that option appears to limit rather than extend . . . choice. . . . Thus, in situations where no real choice exists vis-a-vis the proffered incentive, one cannot claim . . . waiver. . . . Nonetheless, there are events where it appears that a real choice is made . . . .").

for the surge protector incident prompted the plaintiff to make an appointment to meet with Nowak, a personnel supervisor. When told on December 26, 1990, that, because of the surge protector incident, the defendant wanted him to submit to an evaluation, the plaintiff replied "no problem." Before signing the consent form, however, the plaintiff, only "to be clever," asked what would happen if he did not consent. Prior to signing, the plaintiff did not voice any objection to the evaluation, and, in fact, he stated three times that he had "no problem" submitting to drug testing. During his meeting with Nowak, which took place on December 26 after he had submitted to the drug testing, the plaintiff again expressed concern about being disciplined for the surge protector incident. He did not, however, voice any objection to the drug testing.[11]

---

[11] The defendant presented its consent argument to the trial court in its posttrial brief as follows: "The events leading to the urinalysis which was performed on December 26, 1990, demonstrate that [the plaintiff] consented to that drug test. At trial, [the plaintiff] testified that he told Mr. Smith that he had 'no problem' submitting to a fitness for duty evaluation when they met on December 26, 1990, following the incident of theft and lying. . . . Likewise, Mr. Feeney testified that he specifically recalled [the plaintiff] stating that he had 'no problem' taking the test, that he would do it, and that he affirmatively represented that he was not on drugs. . . . [The plaintiff] testified that he was willing to submit to the test because he wanted to prove to his bosses at [the defendant] that he did not have a drug problem at that time. . . . [The plaintiff] also expressly indicated that he consented to the fitness for duty evaluation on the original consent form which was provided to him by [the defendant]. . . .

"[The plaintiff] also admitted that he never told Mr. Smith, Mr. Feeney, or Dr. Kanfer that he did not want to submit to the urinalysis. . . . In fact, Mr. Smith testified that since [the plaintiff] was concerned about losing his job because of his theft and repeated lies, he did not seem to be concerned about submitting to a drug test. . . . Likewise, while both Mr. Smith and Mr. Feeney testified that they remembered [the plaintiff] simply signing the consent form to undergo the fitness of duty examination, neither of them recalled any discussion with [the plaintiff] about what would happen, if anything, if he did not agree to the examination. . . . Finally, when [the plaintiff] reported to Dr. Kanfer for the examination, he willingly signed the consent form provided to him by Dr. Kanfer and he provided a urine sample for use in a urinalysis drug test. These facts demonstrate that [the plaintiff]

In an attempt to provide further support for its theory that the plaintiff's motivation for consenting to the drug test was a reasonable concern that he might be fired for the surge protector incident alone, at trial the defendant inquired of Finnegan if attempted theft and lying were grounds, under company policy, for termination of employment. The plaintiff objected, asserting that the defendant had not pleaded mixed motive as an affirmative defense and that, therefore, Finnegan's testimony would not be relevant. The defendant argued that, in addition to being relevant to whether the defendant had an independent reason for firing the plaintiff under a mixed motive analysis;[12] see *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 106, 671 A.2d 349 (1996) (once plaintiff establishes prima facie case that employer considered impermissible factor in terminating employee, defendant employer must prove it would have made same decision without impermissible factor); the proffered testimony also was "relevant as to . . . what was [the plaintiff's] state of mind as of the time he was asked to either consent or not consent to the test. And we are very much going to contest the issue of whether these were consensual urine sample tests. We believe they were, because he knew he was going to be terminated or could be terminated for the behavior of the afternoon . . . ." The court excluded the testimony without explicitly stating the grounds for its ruling.

Testimony that the defendant legitimately and reasonably could have terminated the plaintiff's employment solely on the basis of the surge protector incident was relevant to the defendant's theory of consent,

voluntarily consented to the urinalysis drug tests and that he was not coerced by [the defendant] to submit to the tests."

[12] The defendant again claims on appeal that Finnegan's testimony was admissible under a mixed motive analysis. We express no opinion as to that claim.

namely, that the plaintiff agreed to the testing because he legitimately feared that he would be disciplined for the surge protector incident. The question of whether consent to a search was given voluntarily is normally to be decided by the trial court upon all the evidence before the court together with the reasonable inferences to be drawn from that evidence. *State* v. *Jones*, 193 Conn. 70, 79, 475 A.2d 1087 (1984); *Dotson* v. *Warden*, supra, 175 Conn. 619. Finnegan's testimony, when taken together with the plaintiff's own testimony regarding his state of mind at the time he consented to the December 26 testing, is capable of supporting an inference that the plaintiff consented voluntarily, out of a legitimate fear of termination as a result of his attempted theft and dishonesty. We conclude, therefore, that the trial court improperly excluded Finnegan's testimony and thereby incorrectly precluded evidence concerning the plaintiff's state of mind at the time he consented to the December 26 testing.

"We have often stated that before a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . When determining that issue in a civil case, the standard to be used is whether the erroneous ruling would likely affect the result." (Citations omitted; internal quotation marks omitted.) *Swenson* v. *Sawoska*, 215 Conn. 148, 153, 575 A.2d 206 (1990). It is reasonably likely that the result in this case would have been different if evidence regarding the plaintiff's state of mind at the time he consented to the December 26 testing, including Finnegan's testimony concerning company policy, had been admitted, considered and credited.[13] We conclude, therefore, that the trial court's

---

[13] When considering the consent issue both during and after trial, the trial court apparently concluded that, once the specter of the plaintiff's termination had been raised, his consent could not have been voluntary, regardless of the other evidence adduced at trial regarding the factual backdrop against which the plaintiff's consent had been obtained and the plain-

failure to consider testimony material to the plaintiff's state of mind at the time he consented to the December 26 testing was harmful and, therefore, the defendant is entitled to a new trial.

## II

The defendant also claims that the trial court improperly determined that it had lacked the "reasonable suspicion" necessary, pursuant to § 31-51x (a),[14] to require the plaintiff to submit to a urinalysis. Although we already have determined that a new trial is appropriate, we address certain elements of the defendant's claim to the extent that those elements are likely to arise again on retrial.

The trial court concluded that "[i]t was Dr. Kanfer who determined that [the plaintiff] should undergo the drug test on December 26, 1990." Therefore, in order to

tiff's actual state of mind at the time he consented. Referring to the language of § 31-51x (a), which provides that "[n]o employer may require an employee to submit to a urinalysis drug test unless the employer has reasonable suspicion," the court stated during trial, "I [interpret] being required [to mean that] the employee is told if you don't sign the form and consent, you will be fired. To me that is not voluntarily agreeing to take a test." In its memorandum of decision, the trial court concluded that "[the defendant's] claim that [the plaintiff] consented to this test is rebutted by the 'consent' form it required [the plaintiff] to sign before the test was conducted. . . . The consent form authorizes [the] defendant to administer a urinalysis drug test and cautioned [the plaintiff] that if he refused to sign the consent form he was subject to termination. . . . Further, as [the] defendant's own drug testing policy makes clear, [the plaintiff] did not have a choice as to whether or not he could consent to the drug test. An employee's refusal to be tested for substance abuse will lead to automatic termination."

Although we do not address it as an independent claim of error, we note that the trial court's consideration of the threat of termination alone, and without regard to other evidence relevant to the plaintiff's state of mind when he consented, exacerbates the harm caused by the improper exclusion of Finnegan's testimony. We emphasize, therefore, for purposes of retrial, that the issue of the voluntariness of one's consent requires a careful consideration of the totality of the circumstances. See *Schneckloth* v. *Bustamonte*, supra, 412 U.S. 233; *State* v. *Torres*, supra, 197 Conn. 627.

[14] See footnote 3 of this opinion.

ascertain whether the defendant had had a reasonable suspicion that would justify the drug test pursuant to § 31-51x, the court focused its attention upon the facts available to Kanfer. Because, according to the trial court's findings, Kanfer knew only about the surge protector incident and an attendance problem in 1989, the trial court concluded that the defendant had lacked the requisite reasonable suspicion.

Although we concur with the trial court's determination that the surge protector incident, coupled with an attendance problem the previous year, would not justify a drug test under § 31-51x, we agree with the defendant's claim that the trial court's factual finding that Kanfer was the sole decision maker is clearly erroneous. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings." (Internal quotation marks omitted.) *State* v. *Webb*, 238 Conn. 389, 449, 680 A.2d 147 (1996).

Kanfer was neither the sole decision maker nor the primary decision maker. The decision to refer the plaintiff for an evaluation was made by Finnegan. The defendant's Substance Abuse Program Guidelines provide in relevant part that "[t]esting for substance abuse, as part of a fitness for duty evaluation, will be conducted where an employee manifests aberrant behavior and: 1) the supervisor is unable to determine the cause of the behavior after discussion with the employee, or the supervisor has reasonable suspicion to believe that substance abuse is involved, 2) the supervisor has discussed the problem with the personnel manager and the operating unit head, where applicable, and 3) a

medical authority (physician or nurse) agrees that a urinalysis, breath test and or blood test is appropriate." The medical authority's role in the evaluation is either to ratify or countermand, on the basis of medical findings, the supervisor's decision to require drug testing. Accordingly, the defendant's decision to require the plaintiff to submit to drug testing cannot be attributed solely to Kanfer. While Kanfer participated in the decision-making process, it is apparent from the record that Finnegan was the primary decision maker.[15]

In addition to its conclusion that, on the basis of Kanfer's knowledge alone, there was no reasonable suspicion, the trial court also concluded, in the alternative, that "[e]ven if we were to assume that Finnegan made the decision to have [the plaintiff] drug tested and made a determination of reasonable suspicion, the factors that Finnegan would have relied upon" do not support a finding of reasonable suspicion. The trial court then assumed, *without making findings of fact*, that Finnegan had knowledge of: (1) the surge protector incident; (2) the alleged short notice vacation days and half days; (3) the plaintiff's inability to get along with his coworkers; and (4) the plaintiff's borrowing of money from the employee coffee fund that he was charged with administering. Relying on the assumed existence of this knowledge in Finnegan, the trial court nonetheless concluded that those "factors . . . do not, singularly or considered together, indicate drug use or impairment by [the plaintiff] on or off duty."

---

[15] The defendant also maintains that, as a matter of statutory construction, under § 31-51x, it is the collective knowledge of an employer's supervisory personnel that is relevant to the existence of reasonable suspicion because the statute provides that "the employer" must have reasonable suspicion. The defendant claimed at trial that under such a collective knowledge standard, Smith's knowledge regarding an earlier cocaine problem of the plaintiff would support a finding of reasonable suspicion. Because the defendant did not disclose its intent to rely on Smith's knowledge of the plaintiff's earlier cocaine use during the discovery phase of the trial, and because Smith's testimony in that regard was excluded by the trial court for that

We express no opinion on the issue of whether the information available to Finnegan would suffice to create a reasonable suspicion because a proper resolution of the issue would require us to usurp the trial court's function by making the requisite factual findings or to remand the case to the trial court for such findings. Because we have already determined that a new trial is appropriate owing to the evidentiary error, we need not take either course.[16]

The judgment is reversed and the case is remanded for a new trial.

In this opinion BORDEN, NORCOTT and PETERS, Js., concurred.

MCDONALD, J., concurring. I concur with the result and the reasoning of the majority. I should only add that, should there be no discovery bar to the admission of the evidence at the retrial, evidence of the collective knowledge of an employer's supervisory personnel should be admissible as to the existence of reasonable suspicion. In this case, there was evidence that Pfizer knew of the plaintiff's earlier use of cocaine while in its employ.

---

reason, we need not consider whether the collective knowledge of all supervisory personnel is attributable, for purposes of § 31-51x (a), to the employer.

[16] Without further factual findings, we also cannot answer the defendant's claim that the trial court improperly failed to give due consideration to the testimony of its expert, Bruce Rounsaville, a psychiatrist whose deposition testimony regarding the common indicia of drug use was introduced as an exhibit at trial. In its memorandum of decision, the trial court stated: "The court has reviewed and rejected the testimony of Bruce Rounsaville, M.D. for the reason that the issue is one of law, not of psychology." Although we agree with the defendant that the trial court's summary rejection of Rounsaville's testimony was error, we cannot determine whether that error was harmful without factual findings regarding the information upon which Finnegan claimed to have relied to support his suspicion that the plaintiff had been using drugs. Without such findings, we cannot assess the probative value of the expert's testimony or its likely effect upon the outcome of the trial.

As the majority notes, we have equated our statute's protections with the protections under the fourth amendment to the United States constitution. Fourth amendment law recognizes that the collective knowledge of the police determines probable cause. See *Whiteley* v. *Warden*, 401 U.S. 560, 568, 91 S. Ct. 1031, 28 L. Ed. 2d 306 (1971); see 2 W. LaFave, Search and Seizure (3d Ed. 1996) § 3.5 (b), p. 259 n.46. "Reasonable suspicion is a lesser standard [for belief] than probable cause." *Wrightsell* v. *Chicago*, 678 F. Sup. 727, 732 (N.D. Ill. 1988); *Smith* v. *White*, 666 F. Sup. 1085, 1089 (E.D. Tenn. 1987). The collective knowledge of the employer should determine reasonable suspicion for the drug testing.