[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this action plaintiff alleges that his employer Pfizer, Inc. required him to submit to drug testing in violation of General Statutes § 31-51x. He claims that Pfizer unlawfully terminated his employment on the basis of the results of these tests, and by his second amended complaint, he seeks redress for this invasion of privacy and intentional infliction of emotional distress.
The case was first tried to the court in 1996. After reversal by the Supreme Court, the matter came before this court on a remand for a new trial. Poulos v. Pfizer, 244 Conn. 598,711 A.2d 688 (1998).[1]
For reasons hereinafter stated, judgment is rendered in favor of defendant.
The case involves a claimed violation of General Statutes § 31-51x which reads as follows:
Sec. 31-51x. Drug testing: Reasonable suspicion required. Random tests. (a) No employer may require an employee to submit to a urinalysis drug test unless the employer has reasonable suspicion that the employee is under the influence of drugs or alcohol which adversely affects or CT Page 3270 could adversely affect such employee's job performance. The Labor Commissioner shall adopt regulations in accordance with chapter 54 to specify circumstances which shall be presumed to give rise to an employer having such a reasonable suspicion, provided nothing in such regulations shall preclude an employer from citing other circumstances as giving rise to such a reasonable suspicion.
 (b) Notwithstanding the provisions of subsection (a) of this section, an employer may require an employee to submit to a urinalysis drug test on a random basis if (1) such test is authorized under federal law, (2) the employee serves in an occupation which has been designated as a high-risk or safety-sensitive occupation pursuant to regulations adopted by the Labor Commissioner pursuant to chapter 54, or (3) the urinalysis is conducted as part of an employee assistance program sponsored or authorized by the employer in which the employee voluntarily participates.
The statute was enacted as a part of a comprehensive legislative plan regulating work place drug testing and was intended to provide the same protections to private employees in Connecticut as those protections that are afforded employees of the federal government by the fourth amendment to the United States Constitution. Poulos v. Pfizer, Inc., supra,244 Conn. 606.
The facts underlying this action are basically the same as those set forth in Poulos v. Pfizer, supra. Most of these facts are undisputed.
In December, 1990, plaintiff was employed as a raw materials clerk at Pfizer's Organics II Department in Groton. He was responsible for ordering materials and office supplies and had authority to order supplies of $50 or less without prior approval. Plaintiff also assisted in the operation of a coffee fund for the benefit of other employees in the department.
On December 29, 1990, a surge protector which he had ordered together with other supplies was delivered to the work place. The list price for the surge protector was $10.95, but Pfizer was charged a discounted price.
Mr. Poulos decided to take the surge protector home with him when he left the plant. He placed the surge protector in an empty CT Page 3271 copy paper box to remove it from the plant without detection. A fellow employee observed this and notified the general foreman, Mr. Feeney. Feeney informed the guard on the gate and requested that the contents of any boxes carried by plaintiff be examined.
When the guard asked plaintiff what was in the boxes, he replied that they were empty. The guard then asked that the boxes be opened, Mr. Poulos complied and the surge protector was discovered. Plaintiff then lied to the guard telling her that the surge protector had been given to him by an employee. The guard, however, refused to allow plaintiff to remove the item without a proper pass.
Plaintiff then returned to the plant and attempted to get a pass to permit removal of company property from the plant. Knowing that employees were sometimes allowed to remove items which had been worn out in service, plaintiff substituted a worn extension cord for the surge protector and requested a pass from Feeney so that he could remove it. Feeney refused to give the pass. He did not tell Feeney about the surge protector or the incident with the guard. Plaintiff then attempted to obtain a pass for this item from the department manager, Richard Smith. If plaintiff had been successful in obtaining the pass, he would have substituted the surge protector for the cord and removed it from the plant. Plaintiff then left the plant without the cord or surge protector. At home, he did not enjoy his birthday because he feared that he would be terminated from his job because of the incident.
The next morning, December 21st, plaintiff returned to work at the usual time and went to Feeney's office. His first words to Feeney were "Am I in trouble?" Feeney replied, "Yes, Tom, you are." Plaintiff asked what he could do to make it easier on himself and Feeney replied that he should start by telling the truth. Plaintiff then falsely stated that he only wanted to borrow an extension cord. When Feeney told him about his conversation with the guard, plaintiff again stated that it was the extension cord which he had shown to Feeney. Feeney replied to the effect that plaintiff was calling the security guard a liar. Eventually, plaintiff admitted that it was the surge protector which he attempted to remove rather than the extension cord.
The situation led to a meeting involving Feeney, Smith and plaintiff. At the meeting, plaintiff asked Smith if he would lose CT Page 3272 his job because of the incident. Smith replied that this was probable, the incident was very serious and that some form of discipline would be forthcoming, but he could not then say what it would be. Plaintiff was ordered to surrender his keys, leave work and that he would be contacted. Plaintiff then thought he would lose his job.
While he was at home, plaintiff on his own initiative, called Marylou Nowak, a personnel supervisor at Pfizer and made an appointment to discuss the status of his employment.
Later in the day on the 21st, a meeting was held in the personnel department to consider what should be done concerning plaintiff. In addition to the surge protector incident, other aspects of plaintiff's work place behavior were discussed. At the end of the meeting it was decided that plaintiff's behavior fell within Pfizer's definition of aberrant behavior and the decision was made by Mr. Finnegan that plaintiff should be requested to submit to a fitness for duty evaluation on December 26th.
Subsequently, plaintiff was notified that he should report for work on December 26th at the usual time.
Plaintiff reported for work on the 26th as requested and met with Mr. Feeney at Smith's office. He was then notified of the decision concerning the fitness for duty evaluation and asked to submit to the evaluation. Plaintiff, who was familiar with Pfizer's drug free workplace program, agreed to the evaluation and signed a consent form. He was then accompanied to the plant medical facility where he was interviewed by Dr. Paul Kanfer, plant physician. After signing a second consent form, plaintiff provided a urine sample. He was then sent home.
When he returned to work on January 2, 1991, plaintiff was informed that the results of the test revealed cocaine use. He was then offered the opportunity to enroll in Pfizer's employee assistance program. This program would require random drug testing. Plaintiff was informed that refusal to participate in the program would result in termination of his employment.
Plaintiff agreed to participate in the program. On March 1, 1991, his employment was terminated because a random drug test conducted on February 13th disclosed his use of cocaine.
The principal issues involve the mixed questions of law and CT Page 3273 fact and may be stated as:
 I. Whether the drug test administered by Pfizer on December 26, 1990, was performed with plaintiff's consent.
 II. Whether Pfizer had reasonable suspicion to require plaintiff to undergo the drug test on December 26, 1990, as required by § 31-51x.
 I
The first issue which must be considered is whether the drug test administered by Pfizer on December 26, 1990, was performed with plaintiff's consent.
Section 31-51x was designed to protect the privacy rights of employees from employer-mandated urinalysis drug testing. The statute is analogous to the Fourth Amendment which protects privacy rights of employees against such federal government mandated testing. Doyon v. Home Depot U.S.A., Inc., 850 F. Sup. 125,128 (D. Conn. 1994); Poulos v. Pfizer, supra, 244 Conn. 606.
The parallel between a private sector employee's rights under our statutory scheme and a federal employee's rights under thefourth amendment obviously would allow an employee to consent to drug testing and waive his rights under § 31-51x, just as he could waive his fourth amendment rights. See Schneckloth v.Bustamonte, 412 U.S. 218, 233, 93 S.Ct. 2041, 36 L.Ed.2d 854
(1973). "Moreover, allowing an employee the ability to consent to drug testing, and thereby eliminating the risk to the employer that it will be forced to prove reasonable suspicion in future litigation is supported by other legislative history indicating a strong legislative preference for employee assistance programs, rather than summary termination of employment for misconduct."Poulos v. Pfizer, supra, 244 Conn. 607.
Government employees, therefore, generally may not be required to submit to an unreasonable search as a condition of continued employment. Doyon v. Home Depot, U.S.A., Inc., supra850 F. Sup. 129. An employee, however, may waive his rights to challenge the constitutionality of a search by voluntarily consenting to that search." Poulos v. Pfizer, supra,244 Conn. 608-609.
Subsection (b)3 of General Statutes § 31-51x provides CT Page 3274 that an employer may require urinalysis drug testing as a part of an employee assistance program where the employee voluntarily participates in the program.
Plaintiff's intent or mental state at the time he submitted to the tests may be inferred from his statements or action. Statev. Moye, 177 Conn. 487, 491, 418 A.2d 870 (1979). "To ascertain whether consent is valid, courts examine the totality of all thecircumstances to determine whether the consent was a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority. . . . Voluntariness can be found from an individual's words, acts or conduct. . . . Noone factor is controlling. . . . A conclusion about consent necessarily involves an inquiry into the putative consenter's state of mind." Poulos v. Pfizer, supra, 244 Conn. 609. (Citations omitted; internal quotation marks omitted.)
Central to a determination as to whether or not plaintiff voluntarily consented to undergo the fitness for duty evaluation which involved urinalysis drug testing was the fact that, from the time of the surge protector incident on December 20, 1990, through December 26, 1990, when the test was given, plaintiff was greatly affected by a fear that he would be terminated from his employment. Evidence supporting this conclusion is substantial.
Plaintiff must have known that his conduct on the 20th, which involved a breach of trust with his employer and lying to two supervisors, would be considered a serious matter by Pfizer. Plaintiff's conversation with Feeney on December 21st reflects this. His first words to Feeney were "Am I in trouble?" When Feeney replied in the affirmative, plaintiff inquired how he could make it easier on himself. At the subsequent meeting with Smith, plaintiff asked if he might be terminated over the surge protector incident. Smith assured him that the incident was considered serious and that he might well lose his job because of it. When he was ordered to surrender his keys, plaintiff considered that as an indication that he might well be fired. After plaintiff had been sent home on December 21st, his call to set up an appointment with Mr. Nowak to discuss his employment situation is further evidence that he was greatly concerned over loss of his employment.
It is only logical to conclude that the concern for his job was uppermost in plaintiff's mind when he met with Feeney and Smith on December 26th. CT Page 3275
When plaintiff returned to work on December 26th, he met with Feeney at Smith's office and was notified that he had been referred for a fitness for duty evaluation. Plaintiff knew that the evaluation involved drug testing.
Plaintiff had drug problems in 1989 and had voluntarily participated in the assistance program which Pfizer maintained for employees with drug problems. At the time. plaintiff had discussed his drug problem with Mr. Smith. Although there was no evidence that plaintiff's prior drug involvement played any part in the decision to order the fitness for duty evaluation, plaintiff was acutely aware that his supervisors knew about his prior drug problem.
The employee assistance program which plaintiff had participated in was a part of Pfizer's overall program in support of a drug free workplace. There was an effort to acquaint all employees at the Groton plant with this program and there was considerable evidence to confirm plaintiff's position that he was familiar with the program. Although plaintiff stresses the importance of that portion of the program which provides that if drug testing is ordered and the employee refuses to submit to the test, sign a consent form and cooperate fully, the employee would be subject to termination, the entire program must be considered.
Although the Pfizer's substance abuse policy is set forth in a number of documents in evidence, as it applies to this case, it may be stated in summary that the objective of the plan was to provide a safe and healthful work environment. It established a policy under which the presence of illegal drugs, such as cocaine, in an employee's system on company premises was prohibited. The policy also stated that Pfizer was committed to assist employees who were using drugs to overcome such problem and to take reasonable efforts to provide support to employees seeking assistance. (This was the program which plaintiff had previously been involved in.) The policy goes on to state that where an employee, such as plaintiff, "exhibits aberrant behavior or where the company has reasonable suspicion to believe that an employee has taken drugs," the employee would be subject to a fitness for duty physical examination and drug testing. The policy further states that the employee would be advised of the test results and, in most cases, where a positive finding was made, referral would be made to an employee assistance program. It was stated that Pfizer "intends to help those employees who CT Page 3276 are abusing drugs or alcohol provided job performance remains satisfactory. . . ."
As plaintiff points out, the official policy statement and other informative documents issued by Pfizer contain the following provisions:
 In the event that an employee refuses to submit to a drug and/or alcohol test, to sign a consent form, to cooperate fully and fulfill all the requirements of the counseling and/or treatment program, or to consent to random post-treatment testing, the employee will be subject to termination of employment.
It is plaintiff's position that, although he signed the consent forms and subjected himself to the testing, the consent was not freely and voluntarily given. The ultimate question on the issue of consent is "whether the will of the consenting individual was overborne, or whether the consent was his unconstrained choice. . . ." (Citation omitted; internal quotation marks omitted.) State v. Vargas, 34 Conn. App. 492,496-497, 642 A.2d 47 (1994). Voluntary consent cannot be obtained by duress or coercion express or implied. State v. Delgado,13 Conn. App. 139, 147, 535 A.2d 371 (1987). "Consent is more than just a mere acquiescence to a claim of lawful authority." (Internal quotation marks omitted.) Id.
It is plaintiff's position that his consent to the test was not voluntary, but was the result of duress and coercion. He was aware of Pfizer's drug free workplace policy and he testified that if he did not sign the consent forms and acquiesce in the drug test, he would be sent home pending termination and would be fired. Plaintiff testified that he never told Mr. Smith that he did not want to take the test because he knew he had no choice. His testimony was that he had to take the test.
The case law in such situations is that consent is not voluntary when it is required as a condition of employment. "Building on this precedent, courts have recognized that consent to drug tests where the employee legitimately fear[s] termination is coercive." (Internal quotation marks omitted.) Doyon v. HomeDepot U.S.A., Inc., supra, 850 F. Sup. 129.
In considering plaintiff's testimony, his credibility and the weight to be afforded, such testimony must be evaluated. The CT Page 3277 record contains a number of obvious falsifications by him. In the surge protector incident, for example, he engaged in a pattern of lying in an attempt to further his own ends.
Whether consent is voluntary or not must be determined considering the totality of the circumstances. The question must be decided on the basis of the evidence that the court finds credible along with the reasonable inferences that may be drawn from that evidence. State v. Vargas, supra, 34 Conn. App. 496.
Consent given for the purpose of obtaining a legitimate benefit may constitute a valid waiver of fourth amendment rights.Poulos v. Pfizer, Inc., supra. 244 Conn. 610; Zap v.United States, 328 U.S. 624, 628, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946). See also Mararri v. W.C.I. Steel, Inc., 130 F.3d 1180 (6th Cir. 1997), in which a party agreed to urine testing as a condition of continued employment where the employer had cause for termination. The mere fact that an individual is faced with a difficult choice of options which may have exerted pressure on him "is not the deliberate or ignorant violation of personal rights that renders apparent consent ineffective." State v.Torres, 197 Conn. 620, 627, 500 A.2d 1299 (1985).
The record is clear that when plaintiff returned to work on December 26th, he was greatly concerned about being fired because of the surge protector incident and lying to his supervisor. He had already asked how he could make it easy on himself and had scheduled a meeting with personnel officer Nowak to discuss his situation.
Upon being informed that he was being asked to submit to a fitness for duty evaluation and knowing that this would involve drug testing, plaintiff indicated that he had no problem with that. At the time, plaintiff knew that management, or at least Smith, was aware of his prior drug use. He had no way of knowing this was a factor in the decision that he be referred for treatment.
Plaintiff knew that he was in trouble with his employer and that his continued employment at Pfizer was at risk. He had good reason to believe that if he refused to cooperate with management by undergoing the fitness for duty evaluation and drug testing, this would be an added factor which could result in his termination. CT Page 3278
Pfizer made a concerted effort to acquaint all of its employees with the drug program. The evidence is clear that plaintiff was well acquainted with this program. He certainly must have been aware that a strong commitment to assist employees to overcome their drug problems was a part of that program.
By cooperating with management in taking the test, he would be ameliorating the effect of the surge protector incident, and to paraphrase language he used on December 21st, would be making it easier on himself. Plaintiff must have realized that there was little risk in taking the drug test. Under Pfizer's policy if, as happened, the test was positive, he would probably be given the opportunity to enroll in the employee assistance program which he did.
Under the circumstances of this case, it may be concluded that plaintiffs agreement to participate in the fitness for duty evaluation and subsequent drug testing was voluntary and a valid waiver of his rights under § 31-51x. By agreeing to the evaluation and testing, he obtained a legitimate benefit and saved his employment which he perceived to be in jeopardy over the surge protector incident. See Poulos v. Pfizer, Inc., supra;Zap v. United States, supra; Mararri v. W.C.I. Steel, Inc., supra. Plaintiff's situation was quite different from that of the plaintiff in Doyon v. Home Depot U.S.A., Inc., supra.
The facts do not indicate that there was any duress or coercion applied to force plaintiff to take the test. The evidence indicates that it was to his advantage to participate in the evaluation, and he entered into it and signed the releases voluntarily.
All of plaintiff's words and actions were consistent with the conclusion that he participated in the evaluation and testing voluntarily. His initial response to the testing was that it would not be a problem. At no time did he ever object to the testing or indicate in any way that he did not wish to participate or that he was unhappy with the situation. He gave the impression that he was anxious to cooperate, and he signed both releases and participated in the interview with Dr. Kanfer with no indication of coercion.
While negative evidence standing alone might not always indicate voluntary consent, under the circumstances of this case plaintiff's failure to indicate by his words and actions that he CT Page 3279 was acting under duress strongly corroborate a conclusion that the test was voluntary.
When plaintiff returned to work on January 2, 1991, he was informed that the test administered on December 21, 1990, was positive and indicated the presence of cocaine metabolites. At that time, he was given an opportunity to enroll in the employee assistance program as a condition of continuing his employment. This program involved random testing at Pfizer's plant as well as outside counseling and testing.
Plaintiff had been in this program before and it is found that he voluntarily entered it again on January 2, 1991, as authorized by § 31-51x(b)(3). There was evidence that while he was participating in the employee assistance program, because of some problem, plaintiff's attorney wrote to Pfizer requesting that he be allowed to continue in the program.
Random drug tests were administered to plaintiff as part of the employee assistance program on January 7th and 23rd and again on February 13th, 1991. There was evidence that the tests administered on January 2nd and 23rd indicated the presence of cocaine metabolites but in such low amounts that they were properly reported as negative tests. When the test administered on February 13th was positive for cocaine use, the plaintiff was terminated from his employment at Pfizer on March 1, 1991.
Based upon the evidence and the logical conclusions which may be drawn from such evidence, it must be concluded that the drug tests administered by Pfizer on December 26, 1990, and the subsequent tests administered as a part of the employee assistance program were all performed with plaintiff's consent.
 II.
Although the decision on the first issue is determinative of the case, the second issue must also be considered. This issue involved whether or not Pfizer had the reasonable suspicion required by General Statutes § 31-51x to direct plaintiff to submit to the urinalysis drug testing which resulted in his discharge. Hennessey v. Hennessey, 145 Conn. 211, 214,140 A.2d 473 (1958).
Section 31-51x requires that an employer must have reasonable CT Page 3280 suspicion that an employee is under the influence of drugs which adversely affects or could adversely affect such employee's job performance before an employee can be required to submit to a urinalysis drug test.[2]
The statute was designed to protect the privacy rights of employees from employer-mandated urinalysis drug testing and is analogous to the Fourth Amendment. Doyon v. Home Depot U.S.A.,Inc., supra, 850 F. Sup. 128; Poulos v. Pfizer, Inc., supra,244 Conn. 606. Under the Fourth Amendment, the federal government may not require an employee to submit to urinalysis drug testing absent a showing of individualized reasonable suspicion. Poulosv. Pfizer, Inc., supra, 244 Conn. 606.
The courts of this state have not directly considered the reasonable suspicion standard in connection with § 31-51x, but there is a considerable body of law concerning this standard in criminal search and seizure cases where the Fourth Amendment
protection is applicable.
In considering this standard, the Appellate Court stated that, "[r]easonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable to show probable cause." (Internal quotation marks omitted.) State v. DaEria,51 Conn. App. 149, 157, ___ A.2d ___ (1998), citing State v. Groomes,232 Conn. 455, 468, 656 A.2d 646 (1995). See also State v. Cofield,220 Conn. 38, 47-48, 595 A.2d 1349 (1991). "Reasonable suspicion, a less demanding standard, requires only some minimal level of justification for making the stop. " Weyel v. Cantania, Superior Court, judicial district of New Haven at New Haven, Docket No. 361996 (July 17, 1997, Barnett, J.) citing INS v. Delgado,466 U.S. 210, 217, 1043 S.Ct. 1758, 80 L.Ed.2d 247 (1984).
"The test of reasonable and articulable suspicion is objective: would the facts available to the officer at the moment of the seizure or the search [,] warrant a man of reasonable caution in the belief that the action taken was appropriate." (Internal quotation marks omitted.) State v. Williamson,10 Conn. App. 532, 541, 524 A.2d 655 (1987), citing Terry v. Ohio,392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). CT Page 3281
Reasonable suspicion must be "grounded in specific and articulable facts." State v. Mitchell, 7 Conn. App. 46, 58,507 A.2d 1017 (1986).
Whether or not Pfizer had the specific and articulable facts which would objectively support a conclusion of reasonable suspicion requires a review of the evidence as to what occurred at the meeting held in the personnel department at Pfizer on the afternoon of December 21, 1990.
The meeting was held in the office of Barton Finnegan, the director of employee and community relations. Those in attendance were Mr. Feeney, Mr. Smith and Ms. Nowak. The purpose of the meeting was to consider the plaintiff's behavior of the previous day and what discipline should be imposed.
The surge protector incident was discussed. This was considered a significant violation since it involved stealing from the company and lying to his supervisors. It was also considered bizarre in that it appeared that plaintiff made a concerted effort to steal an item of small value and then proceeded to complicate the matter by lying to his supervisors under circumstances where it was likely he would be found out.
Other aspects of plaintiff's workplace behavior were also discussed. His attendance record was mentioned. In 1989 he had been warned about half day and short notice vacations, which caused problems for management. Subsequently, his attendance had improved to the extent that he had been commended. Recently, however, the same type of problems with his attendance had arisen but had not resulted in any action.
Plaintiff's borrowing money from the coffee fund to the extent that employees feared that the Christmas party might be in jeopardy were discussed. His borrowing substantial sums of money from other employees was considered.
Incidents involving flare ups with other employees were discussed.
Finnegan was not present for the entire meeting, however, he did return near the end of the meeting when he was briefed on all of the information which had been developed. Based upon that information, Finnegan decided that plaintiff's conduct constituted aberrant behavior and that he should undergo a CT Page 3282 fitness for duty evaluation. This was also the consensus of the meeting.
Finnegan was the corporate employee responsible for implementing the drug free workplace program at defendant's Groton plant. Pfizer had a commitment to the drug free workplace program with a comprehensive substance abuse program. The term "aberrant behavior" is found in the substance abuse guidelines covering active employees such as plaintiff. The paragraph which mentions "aberrant behavior" reads, in pertinent part, as follows:
 "Where an employee exhibits aberrant behavior or where the company has reasonable suspicion to believe that an employee has taken a drug(s) or alcohol, a review will be undertaken on an individual basis. In such case, the employee will be subject to a fitness for duty physical examination, and testing for drugs and/or alcohol will be conducted."
The finding of aberrant behavior subjected plaintiff to a fitness for duty examination and when he reported for work he was so informed. In accordance with the guidelines, plaintiff was escorted to the plant hospital where he was interviewed by Dr. Kanfer. When Dr. Kanfer could find no other explanation for the aberrant behavior as a result of the interview, plaintiff was asked to sign the second consent form and the test was administered.
Defendant claims that the finding of aberrant behavior on the part of plaintiff constitutes reasonable suspicion that he was under the influence of drugs.
As previously noted, plaintiff had a drug problem in 1989 and voluntarily entered defendant employer's assistance program. At that time, he discussed his drug problem with Smith who wrote a memorandum for the file concerning the discussion. There was no testimony, however, that plaintiff's prior drug use was discussed at the meeting. This could have been a significant item. The lack of testimony on the subject leads to the conclusion that it was not discussed or considered. This was probably in compliance with the provisions of Pfizer's substance abuse program that such matters remain confidential. Defendant now claims that Pfizer's knowledge concerning plaintiff's prior drug use should be considered as evidence to support reasonable suspicion. This, however, cannot be done where the evidence clearly indicates that CT Page 3283 it was not considered by the parties involved in the determination of aberrant behavior and reasonable suspicion.
On review of the first trial, the Supreme Court concurred with the trial court's determination that "the surge protector incident, coupled with an attendance problem the previous year, would not justify a drug test under § 31-51x." Poulos v.Pfizer, Inc., supra, 244 Conn. 598. The Supreme Court, however, expressed no opinion on the issue of whether all of the information available to Finnegan would be sufficient to create the reasonable suspicion required by the statute.
The supportive deposition testimony of Dr. Bruce Rounsville was submitted by defendant. Dr. Rounsville was a professor of psychiatry at Yale University School of Medicine and director of research at the divisions of substance abuse within the Department of Psychiatry. He was presented as an expert in this field and it is found that he qualifies as such.
Dr. Rounsville's testimony, however, must be rejected because in the hypothetical question posed to him, he was asked to assume that, in addition to the facts contained in an affidavit concerning plaintiff's behavior, which facts were discussed at the meeting of December 21st, plaintiff's prior drug problem was a known factor. As noted before, the evidence indicates that this was not discussed at the meeting and was not brought to Mr. Finnegan's attention at, or before, he made the determination of aberrant behavior.
Pfizer's policy documents define aberrant behavior as follows:
1. What is aberrant behavior?
 Aberrant behavior may involve a bizarre behavioral incident or a number of uncharacteristic behaviors over some period of time
 (e.g., slurred speech, glassy eyes, unsteady walk, change in normal behavior pattern, sleeping on the job, laughing or crying uncontrollably, appearance of intoxication, displaying unusual work pace, lack of dexterity, mood changes, reduced capacity for rational thoughts, altered attention span and on-the-job accidents.)
CT Page 3284
In American Federation of Gov. Emp. v. Sullivan, 744 F. Sup. 294
(D.D.C. 1990), the federal district court struck down a criterion for employee drug testing which was similar to the Pfizer standard of aberrant behavior. In this case, the standard was, "a pattern of abnormal conduct or erratic behavior."American Federation of Gov. Emp. v. Sullivan, supra, 744 F. Sup. 304
. The court considered the standard both unduly broad and ambiguous and went on to say, "It is unclear, for example, how this standard would be applied to employees who do not exhibit `the physical symptoms of being under the influence of a drug,' as required by the first criterion." Id.
The federal cases also point out the government may search employees only when a clear direct nexus exists between employment and the taking of illegal drugs. The employer's legitimate interest in employee drug testing extends no further than its interest in workplace conduct. National TreasuryEmployees Union v. Yeutter, 918 F.2d 968, 974 (D.C. Cir. 1990).
Section 31-51x compares well with the federal case law. It uses the present time and would require an employer to have reasonable suspicions that an employee was at the time under the influence of drugs which then adversely, or could adversely, affect the employee's job performance. The phrase "under the influence" has been interpreted by our courts on a number of occasions in connection with General Statutes § 14-227a. It is presumed that in including the phrase "under the influence" in § 31-51x, the legislature was familiar with the statutory construction and interpretation which the courts have placed on the phrase. Skorpios Properties, Ltd. v. Waage, 172 Conn. 152,155, 374 A.2d 165 (1976).
As applied to the situation here, "under the influence" would require a reasonable suspicion that at the time of the surge suppressor incident, the plaintiff had become so affected in his mental, physical or nervous processes by taking drugs, that he lacked to an appreciable degree the ability to function properly in relation to his employment and that this adversely affected or could adversely affect his employment. Infeld v. Sullivan,151 Conn. 506, 509, 199 A.2d 693 (1964).
Applying the law to the facts of this case, it must be concluded that Pfizer's decision maker did not have specific and articulable facts which would objectively support the conclusion required by the statute. There was evidence of uncharacteristic CT Page 3285 behavior involving the surge suppressor and other conduct which, while not exemplary, never rose to the level that disciplinary action of any type was imposed.
Of particular significance here is the fact that plaintiff's conduct involving the surge protector came to the specific attention of a guard and two supervisors and none of these parties reported any of the criteria, other than the incident itself, which, under Pfizer's rules would indicate aberrant behavior and being under the influence of drugs. These criteria include slurred speech, glassy eyes, unsteady walk, etc. Certainly if such manifestations had been observed they would have been brought up at the meeting of December 26th and reported to Finnegan.
It must then be concluded that Pfizer did not have reasonable suspicion to require that plaintiff undergo the drug test on December 26, 1990, as required by § 31-51x.
Accordingly, it having been determined that the drug tests administered to plaintiff were performed with plaintiff's voluntary consent, judgment is rendered in favor of the defendant against the plaintiff.
Joseph J. Purtill Judge Trial Referee